May it please the court, I would like to reserve two minutes for rebuttal. Thank you. My name is Rick Lundblade. I represent the plaintiff, the appellant in this matter, Burt Fernandez. We are here before this court in the aftermath of the District Court granting summary judgment to the government on the government's claim that the discretionary function immunity applied. This is a personal injury matter. Very briefly, the facts are that Mr. Fernandez was driving down a state highway down in my neck of the woods in southern Oregon. He was returning to the home base where he worked at the end of his shift. It was a stormy season and a tree immediately adjacent to the highway that was on Federal Forest Service land fell and hit Mr. Fernandez's truck, thereby causing him some pretty significant injuries which are not at issue at this time. The District Court found that under the Berkovitz-Galbert test, the discretionary function immunity function two-part test, that neither of the two parts had been proven such that the case should go forward. At this point, I'd like to talk briefly, I'd like to start, if I may, with regard to part two of the test having to do with whether this is the type of matter in which the choices involved are really those that are meant to be protected by the discretionary function immunity exception. This circuit has repeatedly stated when we have cases involving the government as a landowner, as well as in the context of not involving broad policymaking decisions, that we treat the government like we would a private landowner. And the circuit has also said that when we're dealing with decisions that are made at an operational, ministerial, maintenance level, that decisions are rarely susceptible to a policy analysis. Now, what is clear in this case is undisputed is the government was a landowner in this case. That is undisputed. This also does not involve a case where the circuit, as well as other circuits, have found that broad policymaking type decision, such as fighting forest fires, such as prisoner guard safety, such as regulatory issues with regard to certification of aircraft design. None of those exceptions apply here. This is purely, purely a maintenance issue. And you have to go no further than to the memorandum of understanding between the Oregon Department of Transportation and the Forest Service. And the sections, the relevant sections have been cited in the brief, and it's under the heading maintenance. It is clearly a maintenance issue. Well, the issue is whether there should have been priority given to removing that tree. That is our position, Your Honor. The government and the district court certainly saw it differently. Part of the issue here, and I'll probably address this a little more in part one of the test on whether a mandatory regulation was violated, part of the issue here is that this tree was marked by a Forest Service employee as a danger tree about six months before the tree fell on Mr. Fernandez's truck. About two months after it was marked as a danger tree, this particular tree was offered to a private logging harvest company who had done a bid to force a tract of land in there in which this particular tree was right in the vicinity. The tree itself was not part of the harvest itself, not part of the timber sale, but basically the government went to this private contractor and said, would you like to take this tree as well? The private contractor declined the tree, feeling it was a cull, meaning not merchantable. I think there were also some concerns about liability with the tree if it fell on the highway and legal ramifications of that. The tree was leaning. The tree leaned over, to some degree, over to the highway. That's probably part of the reason why, as we understood it, that the private contractor refused the tree. Where the district court decided, and based on what the government offered, there were about, as I've listed them here, five reasons why Part 2 apparently did not apply. I would like to go over those very briefly, if I may. First of all, there was a cite to environmental preservation, which I do realize that there have been decisions where you don't want to disrupt the natural pristine of our resources, our lands, and what have you. My response to that is that the government cannot have it both ways in this case. You can't, on one hand, say, this is a bad tree, we need it removed, and then, number two, say, well, we left it standing based on environmental concerns. You've got to remember, this was one tree, and there were a couple trees that were marked in this vicinity that were not removed. It's very hard to understand how taking down one or two additional trees, and certainly this one tree at issue, was going to have any ramification on the environment. There was also the cite to economic and resource considerations. In this court, Judge Fletcher, you authored the opinion in Wisnant versus the United States, budget constraints and limited resource arguments could always be couched as policy, but must be narrowly read. The circuit has, perhaps in other than rare circumstances, said we're not going to look to budget and resource considerations. There was also a cite to visitor safety, as well as employee safety. Judge Fletcher, I'm going to address you again, because you authored a very strong dissent two years ago in a case that's cited by the government in their response brief here, called Bailey versus the United States. You may recall that case, the Yuba River flooding case, and you were very critical of the fact that in that particular context, the majority of there was balancing competing safety issues. Also, I want to say, perhaps to you directly on that and to the court in general, is if you didn't get your way in that case, I still think you could have your way in this case, because there's one very important distinction here. In that Bailey case, it was clear that the government had gone out there, waded out into the river, and made an attempt within days after those signs were missing to try to remedy the problem. In our case, over a four to six month period, there was nothing offered by the government in the facts that surrounded the motion to dismiss, or in these briefs, saying what the government actually went out there and did in this case to try to follow that tree, and where the safety of an employee was put at issue. There is none of that here, and to the extent... That's not my phone. Not mine. I needed that. We're getting a call from the Corps of Engineers. Go ahead. Central Intelligence. Something gets done. That's not... I think it's coming through the phone, because I just... Okay. He needs some time back, I think. Thank you. I needed that as much as anybody. Thank you. So I think there's a clear difference in this case as opposed to Bailey. There was also a mention as to the time of the year and the weather involved, and I'll be the first one to say yes. On the night of this night, where someone should be out there trying to cut down a tree, but the government did not explain anything that they had tried to do in those prior, we'll call it four months since the time they offered the tree to this private contractor to do anything over that four months to get rid of it. And finally, the government relied on its 2005 Region 6 Field Guide. And I don't want to get into that too much, but the gist of it is we considered a lot of policy issues when we developed that guide. And that may very well be the case. I wasn't there. My client wasn't there. But the concern here is if we're going to let something that occurred back in 2005 dictate things into the indefinite future, are we then going to put ourselves in a position where we functionally start to swallow up Part 2 of the exception? And there's a case that I didn't cite in the brief that I found over the weekend. I just want to read from this, if I may. It says the fact that a particular act or decision has some remote roots in public policy or could be traced through a distended or indirect route to some earlier policy decisions cannot be sufficient to shield that act with immunity. The case is Hughes v. The United States. It comes out of the Northern District of California, and it's cited with approval two of your sister circuits, First Circuit in a case called Shansky v. The United States. Well, we'll have you fill out a gum sheet. I'm sorry? We'll have you fill out a gum sheet. Okay, I'll be happy. We have them here. I'll be happy to do that, Your Honor. And in the D.C. Circuit, a case called Cope v. The United States. They're both cited in the Hughes case. Our position is on this is that there's nothing that was offered by the government under their burden to show that this really was true policymaking at its finest under Step 2 when we were dealing with something at the ministerial or operational level. It was not met here, and we would ask the court to reverse and remand on that basis alone. Very briefly, I'd like to talk about Step 1 as to whether there's a mandatory requirement that was violated. I will be candid with this court and say that might be the tougher, might very well be the tougher of the two to go off of from our perspective. And there's two kind of competing things going on. Number one, there's two subsections of that Memorandum of Understanding that are at issue here. Subsection 9, Section 9.5.C, which tells the government that when they mark these danger trees, they will dispose of them as promptly as possible. The next subsection, Subsection 5.D, says that if you cannot get rid of these trees through a timber sale process, I believe it continues and says that the federal government will work with the state government to remove the tree. Promptly as possible. As promptly as possible. What does that mean? That's a very good question, Your Honor, and I've been chewing on that one for several months now. Well, would a tree that overhangs a highway require more promptness than one that hung over a walkway? That's a very good question. I don't have the answer to that, Your Honor. I really don't. All I can say is does as promptly as possible mean that given it's the government's burden, do they have the burden to show why there was a reason they couldn't promptly, was it impossible for them to remove it promptly? And again, we were offered no facts in this case to explain why it wasn't as promptly as possible. I think the more general issue is is that specific enough to tell the government when they have to remove it? Because on one hand, the circuit ruled in a case called Bolt where the Army hadn't removed snow and ice within a set time frame. The regulation said late March, late February or March. Someone slips after that time. That one's pretty easy. All right. Judge Fletcher had the Bailey case and the dictate to the government there was that it had to be removed timely. What does timely mean? I don't know. All I know is under the facts of that case, there was an effort to remove or to replace those signs in the river within a week and I think within several days. That couldn't be done. And then you have kind of on the other end over here, you've got a case called Navarette where someone's at a campground walking and falls off of a drop off with the mandate to the government there to have, you will have drop offs properly marked or fenced. The government, I think that was the Army as well, did nothing over two years. Yet it would beg the question, I will agree to this your honor, it begs the question in that case, it just says you will. It didn't tell the government when, but over the context of two years, for whatever reason, the courts in Navarette said that wasn't complied with. So does as promptly as possible give a specific date? No, it does not. However, as I argued in the brief, it gives some urgency certainly. And like I said, as promptly as possible, I think you have to show why it wasn't, why it was impossible to act promptly in over a four to six month period of time. I think that's the key in this case. And for that reason, I would say there's your second basis to reverse the district court. I know I'm almost out of time. The highway is what? The highway, is it a well-traveled highway? It's a well-traveled highway, Highway 62, which runs from Medford, where I live, it goes on for about an hour and a half, if you will, drive time. It runs right by close to Crater Lake. The road's all kind of turn and fork in there. But it's one of the more well-known state highways down in our neck of the woods down there. It just runs north and south? It runs generally north and south, yes, sir. From Medford? From Medford. I'd say it kind of runs parallel with I-5, but sometimes these things run northeast, southwest. It's a little bit crooked there. Is the discretion, is it making a difference if the discretion is subject to some limitation, that the greater the danger, the less the discretion? That's never been my understanding, Your Honor. It's simply whether there's discretion allowed or not under the context of, again, what we're dealing with. I don't know that the gravity of the severity of the danger itself, if you will. Shouldn't there be? I would certainly like to see it be, yes, sir. I know I'm already over time, and I don't know if you already gave me credit for the phone ringing or not, unless the Court has any other questions. Well, check your next phone, Bill. I will. Thank you, Your Honor. You got your discount. Thank you. May it please the Court? Kelly Zusman appearing on behalf of the United States. Mr. Fernandez understandably focuses upon the one tree that fell in the forest on his car, as he's alleged in his complaint. But the discretionary function exception looks at the function, and the decision-maker who's been challenged in this case is, in fact, the district ranger, Mr. Dewberry. And Mr. Dewberry explained to the district court, the district court accepted, that what we're dealing with here is actually a 1.8 million acre forest and thousands of trees that have been marked and are still standing as potential danger trees. And I think when we're looking at discretionary function and we're concerned about how much of a danger, the MOU spells this out. This was a potential danger tree, not an imminent danger tree. We know that trees that were identified as an imminent danger had to be removed in an expedient fashion, and that was a burden placed upon the Oregon Department of Transportation. All other potential trees had to be removed, either promptly as possible, which we attempted to do through the timber sale, or, if we're under subsection D, simply had to be removed at some point. Now, Mr. Fernandez starts with point two, but under the Berkovitz test, we begin with point one, which is, is this discretionary? And clearly, there is no mandatory rule, policy, or anything that tells the Forest Service, okay, that tree is a potential danger, you've got to go remove it right away. And we know from Mr. Dewberry. But that's not what it says. It says as promptly as possible. So stick to the facts. And as promptly as possible, we attempted to do that through the timber sale. Well, that doesn't sound very prompt to me. Four and a half months? Yes. We've got a big, big, you've got a tree right on the highway. It's not unusual for trees to fall on the highway. That's true. As promptly as possible, to me, doesn't mean four months later. And as promptly as possible is going to entirely depend upon the context. Now, we know from other people who work for the Forest Service that there are potential danger trees that have been standing for years and years. So four and a half months in the life of a tree is not particularly long. Now, we also know that from the district ranger, that there are a whole host of things that he takes into account in cooperation with the Oregon Department of Transportation when they are prioritizing. Okay, we've got thousands of trees out in the forest that are marked as potential danger. Didn't this contractor that turned that down, wasn't there something said about the tree being infected that really wasn't usable for timber? When they cut the tree down, well, actually, when the tree came down, they discovered that there was, in fact, root rot. But Mr. Dodenhoff, who you're referring to, he was the one that was the private contractor who did the timber sale. He actually testified in his deposition that that particular tree didn't look any different from any other tree he'd seen between Prospect and Union Creek. Except that it was leaning over the highway. I would say its location would have something to do with what would as promptly as possible mean to people. Certainly, and if I may, at first the testimony was there was a slight lean over the road, not a significant lean. And then in terms of the promptly as possible, again, this was one of thousands of trees out there. What was the policy that had been adopted? A tree is marked as a potential danger tree. Correct. So it should be removed as promptly as possible. What does the Forest Service do to determine when it's going to be cut? Again, for Mr. Dewberry, what he explained was he meets regularly with the Oregon Department of Transportation, and they prioritize. Okay. We've got one tree leaning over a roadway. We've got another tree leaning over a parking lot. Okay. Well, now, as to this tree, what was done? When did they say they needed to take it down? Was it going to be the first tree to come down, the tenth tree? What had they done to prioritize the removal of this tree? And we don't have anything specific to show that they met to discuss this particular tree and where it fell within the pecking order. Well, you just talked about prioritizing. What does that mean? And what it means is it's susceptible to policy analysis. And I would direct this Court's attention to the Vickers case, and Vickers involved a very similar situation involving timing, the timing of the removal of an employee who is considered to be a danger who had a firearm. And the question was raised there, well, you identified him as someone who should have been removed as a danger, but you sat on it for a year. And what this Court held was, so long as it is susceptible to policy analysis, that's sufficient for discretionary function. We don't have to prove that anyone actually, you know, listed out, okay, here are all of our potential danger trees. So you're comparing an employee to a dead tree, is that it? I guess I am. You've heard of Deadwood. But I think the analogy, though, is the same. Both Vickers and Bailey deal with the issue of timing, timing of decisions. What I've tried to get you to focus in on, what did they do to prioritize the removal of these potential danger trees? Anything? Yes, they do. And when was this tree to be removed? Not later than when? Or what had they done in respect to this particular potential danger tree? I have two answers to your question. The first is, what do they do in terms of prioritization? Well, for Mr. Dewberry, they take into account environmental considerations. And Mr. Fernandez said, well, there can't be any, because they already cut all the other trees. Not so. Well, if there's a tree that is marked as a potential danger and there's a spotted owl nest or there's a red squirrel living in that tree, that's an environmental concern that may play into this. Yes, but was that the fact here? No, but, again, it doesn't have to be. It just has to be susceptible to policy analysis. It has to involve competing considerations. Environmental is one of those. The other thing they look at is the timing. What would the consideration be when they realized they wanted to get these trees cut down? They offered them to the contractor, and he said, I don't want them. Didn't take any of them, did he? Actually, he took almost all of them except four. Why didn't he take the four? Well, he didn't take this particular tree, he explained in his deposition, because he was concerned about damage to the road. And he didn't want to be liable to the state of Oregon for damage to the road that may have happened during the removal of that tree. And the contract didn't require him to take the tree. Yeah, I know, but he was afraid the tree would fall on the road? Yes. He was afraid the tree would damage the road during the removal process. Yeah.  It doesn't change the analysis, though. The question raised is, did the Forest Service have to remove that tree before the tree fell? And my answer is, there is nothing in any policy, regulation, or statute that told the Forest Service, you must go out there and by November 1st or December 1st or December 30th or January 30th and remove that tree. There's nothing here that dictates that. I'd say as promptly as possible. What does that mean? That means that it is something within the discretion of the Forest Ranger, taking into account environmental considerations, staffing issues, resource issues, balancing public safety against the safety of Forest Service employees, all of those factors. Where does it say that? Dewberry says that in his affidavit. And that's at pages 35 to 37 of the record. Where does it say that in the statute? We don't have a statute that mandates anything relative to danger trees. Well, this is in the regulations. The regulations. As promptly as possible. It must have some kind of meaning. The as promptly as possible language comes from the Memorandum of Understanding. That's in the record at 134. You're talking about social, economic, and political policy? Is that what you're talking about? Well, I'm talking about what the district ranger testified about, all of the considerations that go into prioritizing which trees will be removed and when. Consideration of danger to the public coming there? Absolutely. Yes. Well, there's nothing to show that they have done the prioritizing. Is that accurate? We do know that there's nothing to show that they engaged in a specific prioritization relative to this tree that went down at milepost 52.8. But we do have evidence in the record from the district ranger that, yes, he prioritized these types of decisions when looking at the removal of potential danger trees. But it's nothing to show that he's done anything to prioritize. If I had seen in the record that this tree is a potential danger but not as dangerous as trees X, Y, and Z, that would give me a comfort level. But there's nothing in the record to suggest that they did anything after the contractor said, I don't want the tree. And I don't disagree with that. I don't have anything in this record, Judge Fletcher, that could tell you that they looked at this particular tree and decided, no, we can hold off for another six months or another year and a half on that. What I can tell you is that the law doesn't require it, that at Vickers there was no evidence that the INS in that case actually considered certain policy issues when they held on to the termination of that employee for over a year, and even though they had promised a decision as promptly as possible. But what this court held was because it was subject to a policy type of analysis, the discretionary function exception applied. And the other thing that I think is important here, so this is something that the district court also hooked into, is that once we satisfied that first prong, once we have convinced the court that this is in fact a discretionary decision, that there was nothing mandating the removal of this tree at a particular date, that raises a presumption that carries in our favor on point two, that it is presumed that if it's discretionary, it is infused with policy. And we know between that presumption and between what was presented by Mr. Dewberry and Mr. Toupin and Mr. Stewart is that, yes, we considered this multitude of factors when we determined. Well, what do we know what they considered? What case tells us what you're suggesting is the rule? What cases? In terms of the presumption, that would be the Supreme Court's decision in Gobbert at page 324, discussed the presumption, and it also appeared in this court's decision in Miller and Terbush. So once we've established number one, there's a presumption that it is policy-based for purposes of number two. I'm not sure that we draw the presumption that it's policy-based because we now know that we have a danger tree and we have a determination that it must be removed as promptly as possible. Those are confining facts. So the question is, what is as promptly as possible to mean in this context? And my answer is that's up to the district ranger. It's up to the district ranger to determine what is as promptly as possible given everything that he has to consider and work with. Well, what did he all consider? You have four trees left after that contractor took the rest of them, right? In this particular case. Yeah, in this particular case. We're looking at this particular case. You've got four trees left and one of them, the one that fell on the highway, was the one that he said he didn't want because he thought when it was removal it would damage the highway. And were all four of these trees, did they border the highway? They all did, didn't they? They were close to the highway. I don't know that. Well, you know. We have four trees. How many trees? Do we have any statistics of trees that have fallen on highways and killed people? You read about it. It's not uncommon to pick up the newspapers. It's not uncommon for trees that have been marked as potential danger trees to fall, nor we also know it's not uncommon for perfectly healthy trees to fall, particularly during severe weather conditions like Mr. Fernandez faced on the night of this accident. Is this a matter of just routine maintenance? It is not. It's not routine maintenance because it involves these competing considerations. It involves personnel. This was the timber sale wrapped up about middle of October. That's when we knew that Dodenhof was going to take that tree. This accident took place in February. We know that during the middle of winter is no time to be sending people up to try and remove a tree. We also know that we read the- Is there anything in the record to suggest that it would be dangerous to remove this tree after a snowstorm? I mean, they do it routinely, I think. I mean, after a snowstorm? Because this accident took place in the middle of a snowstorm. But, no, I have nothing in this record to show that it would have been dangerous to remove the tree after the snowstorm concluded. But, again, that's the district ranger's call. He's the one who's looking at what the weather conditions are, what the environmental conditions are, the potential danger from a tree that's been marked as potential, not imminent. Now, I would agree with you. If this tree had been marked as an imminent danger, we would have a different situation. But it was marked as a potential danger. And we know in foresight from the 2008 field guide that potential danger trees are ones that could fall within anywhere from 3 to 10 years. So when we're looking, again, I go back to why is this discretionary? Is that the definition of potential danger, 3 to 10 years? It is from the 2008 field guide, yes. 3 to 10 years. 3 to 10. And we know that imminent trees from that 2008 field guide were ones that were expected to fall within a year. And we know from Mr. Asato, he said, no, I did not mark this as an imminent danger. And there has been no challenge. In fact, Mr. Fernandez has specifically told the court, look, I'm not challenging that determination that Asato made, that this was a potential danger, not an imminent danger. That's not an issue. Well, there is a discretion at that point, and I agree with that. He was wrong, but it is a matter of discretion at that point as to whether you mark it imminent or potential. He was clearly wrong, but. And if that decision, though, but if the decision about whether or not it's imminent or a potential danger tree is discretionary. Yes. Well, and we have all sorts of guidance, and I see that I'm out of time. May I finish my answer? We have all sorts of guidance to Forest Service personnel about how you go about deciding if a tree is an imminent or a potential danger. And they look at all sorts of factors. That's not an issue here. Correct. But what I'm getting to is the point that, by contrast, we have nothing to guide the ranger's discretion about what as soon as possible means. We have nothing there. It's simply up to the district ranger's expertise, his consideration of all of these factors that go into whether or not that potential tree should be removed, when it should be removed, how it should be removed, all fall squarely within that district ranger's discretion. Unless the court has further questions. So we'd come to the same result even if we had a tree that was an imminent danger of falling? I hope you don't come to the same result. I think an imminent danger is a... Well, you told us imminent danger a year to three years. An imminent danger, if a tree has been identified as an imminent danger, according to the 2008 guide, that means they expect it will fall within a year. So a year or less. And the MOU specifically said that if a tree is identified as an imminent danger, the Oregon Department of Transportation has to remove it expediently. And that's a sharp contrast to trees that are identified as potential dangers that have to be removed either as soon as possible, as the district judge here concluded, or if we drop down to the next subsection because the sale didn't work. Well, we know it's as soon as possible, but I don't think you're going to sell us anything short of that. The only other point I would raise relative to that memorandum of understanding... I mean, almost any tree can be a potential danger. Well, exactly. But we're not out there removing all trees, are we? No, no. But was this tree alive? It was. In fact, Dodenhoff testified that there were still green needles on that tree when it went down. So this goes back to, yes, any tree in the forest is a potential danger, particularly in severe weather. Any of them could come down. Any of them could have caused this harm. And if we're going to say that safety is... But this one was marked. Yeah, absolutely. This one was a marked potential danger tree. And if we're going to say that safety is... Which was to be removed as soon as possible. But, again, going back to the issue, the legal issue before the court on discretionary function is, was there discretion in carrying out that directive? And we also know from the Miller case from this court that the fact that a policy or regulation includes some sort of mandatory language doesn't remove it from discretionary function. In the Miller case, you had the multiple fire situation. Yeah, that's completely different. But involves similar language. Involves similar mandatory language. And yet this court still said it involves an exercise of choice, of prioritization, of resource management. The same types of factors that are involved here. Yes, this is a single tree. It's not multiple forest fires. But the analysis is the same. Unless the court has further questions, I would submit. Why is the analysis the same? Because it involves the same discretionary factors. Well, we can disagree about that. Okay. Thank you. Thank you. Thank you. Just very briefly. To be clear, we do not challenge the choice that the government made to rate this as either an imminent danger or a potential danger. That's clear, counsel. That's not an issue. Where I disagree with counsel, Ms. Essman, on this, is this is a matter of maintenance. It is completely a matter of maintenance. And the memorandum of understanding identifies it as an issue of maintenance. That's all it is here. Nothing more, nothing less. Okay. The tree. You made that point right at the start. I wanted just a couple things about the tree. That tree also had a dead top. And if you review the record in there, there was some concern that there might be some rot at the base at the time it was marked. It was found later to have rot. But, again, it was marked as a potential danger tree. Mr. Asado, before he left the Forest Service, which was before the incident, told Mr. Dewberry, whoever was in charge at that time, hey, you've still got a few trees out there. You need to take care of those trees. Mr. Dewberry, when I deposed him or in his affidavit, not one thing about what physically transpired between the timber sale and February as to fact-specific type stuff. What did you do in consideration of removing that tree? That is all I have, unless the Court has questions. Okay. Thank you. Thank you. This matter will stand submitted. And we'll move on to Rubicon Global Ventures v. Kong, Quing, and Lowe.
judges: Walter, Fletcher, Pregerson